UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

BALMORE ALEXANDER VILLATORO,

Petitioner,

v.

ROBERT LEGRAND, et al.,

Respondents.

Case No. 3:14-cv-00467-RCJ-WGC

ORDER

Petitioner Balmore Alexander Villatoro's counseled, amended 28 U.S.C. § 2254 habeas petition is before the court for disposition of the merits of the remaining grounds (ECF No. 9).

**I.    Procedural History and Background**

As set forth in this court's order granting respondents' motion to dismiss in part, on May 15, 2009, a jury convicted Villatoro of two counts of sexual assault (exhibit 22).[1] The state district court sentenced Villatoro to two terms of ten years to life, to run concurrently. Exh. 23. Judgment of conviction was filed on August 4, 2009. *Id.* The Nevada Supreme Court affirmed the convictions on September 29, 2010, and remittitur issued on October 27, 2010. Exhs. 28, 29.

---

[1] Exhibits referenced in this order are exhibits to petitioner's first-amended petition, ECF No. 9, and are found at ECF Nos. 10-13.

1

After an evidentiary hearing, the state district court denied Villatoro's postconviction petition on June 27, 2013, the Nevada Supreme Court affirmed the denial on July 22, 2014, and remittitur issued on August 18, 2014. Exhs. 40, 41, 46, 47.

On or about September 8, 2014, Villatoro dispatched his federal habeas corpus petition for mailing (ECF No. 4). This court appointed counsel, and the first-amended petition was filed on April 9, 2015 (ECF No. 9). On March 4, 2016, this court granted respondents' motion to dismiss in part, concluding that ground 2 was unexhausted (ECF No. 25). Villatoro filed a motion for stay and abeyance, which this court denied (ECF Nos. 28, 29, 31). Villatoro then filed a declaration of abandonment of ground 2 (ECF No. 32). Respondents answered grounds 1, 3, and 4 (ECF No. 36), and Villatoro replied (ECF No. 37).

II. **Legal Standard -- AEDPA Standard of Review**

28 U.S.C. § 2254(d), a provision of the Antiterrorism and Effective Death Penalty Act (AEDPA), provides the legal standards for this court's consideration of the petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693-694 (2002). This court's ability to grant a writ is limited to cases where "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts

with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); see also *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell*, 535 U.S. at 694.

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir.2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id*. The governing standard is not satisfied by a showing merely that the

3

state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir.2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.

### III. Remaining Grounds

#### a. Prosecutorial Misconduct Claim

Villatoro alleges in ground 1 that the prosecutor committed misconduct in her opening statement, and the court failed to remedy the error by granting a mistrial or giving a proposed curative instruction to the jury in violation of his Fifth, Sixth, and Fourteenth Amendment rights to due process and a fair trial (ECF No. 9, pp. 8-13). Villatoro argues that the prosecutor improperly and baselessly suggested that Villatoro's defense counsel had coached Villatoro's girlfriend, a key witness, on her trial testimony.

In reviewing prosecutorial misconduct claims, the narrow issue the federal habeas court may consider is whether there was a violation of due process, not whether there was misconduct under the court's broad exercise of supervisorial power. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). It is "not enough that the prosecutors' remarks were undesirable or even universally condemned[,] [t]he relevant question is whether the prosecutor's comments so 'infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir.

4

2005) (quoting *Darden*, 477 U.S. at 181). The ultimate question before the court is not whether misconduct denied a fair trial, but whether the state court's resolution of the claim was an unreasonable application of clearly established federal law under 28 U.S.C. § 2254(d)(1). *Furman v. Wood*, 190 F.3d 1002, 1006 (9th Cir. 1999).

The trial testimony of both the victim, Tracy Runnels, and Villatoro's girlfriend, Arlee Brown, reflected the following. Runnels and Brown were co-workers and went out drinking together one evening. Exh 18, pp. 32-49; exh. 19, pp. 95-115. They drank heavily, and Villatoro joined them at some point and was also drinking. Later, Villatoro drove all three to Runnels' apartment, but she realized that she did not have her keys. Runnels tried to call her roommate several times but was unable to reach her. Brown suggested that Runnels stay the night in Brown and Villatoro's home. Runnels was very intoxicated and agreed. They had to stop the car on the way because Runnels felt ill, and she vomited repeatedly in a casino or gas station bathroom. When they reached Brown and Villatoro's home, Runnels vomited at least twice more. Brown or Brown and Villatoro made up a pull-out sofa bed in the living room, left a wastebasket near Runnels in case she felt sick, and Runnels passed out on the bed. Brown and Villatoro went to bed in the master bedroom. *Id.*

Runnels testified that when she fell asleep or passed out she was wearing a dress and a sweater. Exh. 18, pp. 50-64. She woke up in the middle of the night because she felt a sharp pain in her vaginal area and pressure on top of her. The top of her dress was pulled down, the bottom of her dress was pulled up, and her bra and underwear were off. She had not removed any of the clothing herself. Villatoro was on top of her and was having sexual intercourse with her. After she told him to stop about three times he stopped and put her underwear back on her. Runnels then blacked out again. She woke up about 7 in the morning and was completely dressed. She thought maybe it was some strange dream but when she got up her back hurt and she had genital pain. Runnels woke up Brown to take her home. As they were driving, Runnels

5

told Brown that she had a memory of Villatoro in bed with her, but that when she drinks she has weird dreams and she wasn't sure if it was a dream. When Runnels got home she noticed blood on the back of her dress. When she showered she had a strong, stinging pain in her vaginal area. She called Brown and said she had blood all over her and she also called her mom to let her know that she thought she might have been assaulted. Runnels went with her mother to the hospital where she underwent an exam and spoke with police. *Id.* On cross-examination Runnels acknowledged that when she woke up in the morning she did not run, scream, call the police, or tell Brown that Villatoro had raped her. *Id.* at 66.

A criminalist at the Washoe County Crime Laboratory testified that Villatoro or any of his paternal relatives could not be excluded as the source of the DNA from an external swab of Runnels' genitalia. Exh. 19, p. 81.

Brown testified that she and Villatoro went to the bedroom, Villatoro wanted to have sex and Brown refused. Exh. 19, pp. 116-166. She stated that they had a physical fight; she was kicking and hitting him. Villatoro finally said he would not touch her, and they went to sleep. Brown said that she did not remember having sex that night, but that her underwear was on inside out in the morning, and therefore, she assumed that she and Villatoro must have engaged in some sort of sexual activity that night. Brown admitted that when she was interviewed by police the next morning she did not tell them that her underwear was inside out and that she thought maybe she had had sex with Villatoro. Brown testified that what she told police was that she was mad at Villatoro, that they had argued and that they had not had sex. She further testified that Runnels called her later that morning from the hospital and told Brown something about bleeding and that it had to do with Villatoro. Brown dropped her children off at daycare and returned home to find Villatoro in the shower. She said this was unusual, that he had "no reason to jump up and take a shower," and that he typically would not shower at that time of day unless he was going to work. Brown then confronted Villatoro. He

6

initially denied that anything happened. Then he told Brown that he "went down on" [had oral sex with] Runnels, and when he realized what he was doing he went to the bathroom and threw up. Brown admitted that she did not tell that to the police; she explained that this was because she did not think it was important at the time. *Id.*

A police officer who went to Brown and Villatoro's in the morning testified. Exh. 19, pp. 167-188. He stated that Brown told him the following: after Runnels called Brown from the hospital, Brown dropped her kids at daycare and went home. Brown told the officer that Villatoro had stripped the sheets off the pull-out sofa bed, put the bed away and returned the cushions to the sofa. Villatoro was in the shower. Brown told the officer that this was unusual behavior for Villatoro, especially after a long night of drinking. Brown said that when she demanded that Villatoro tell her what happened, he said that "she [Brown] wouldn't give it up to him so he went out and got it from out in the living room." *Id.* at 178. The officer asked Brown to come to the police station to give a statement. The officer stated that Brown became vague and evasive when he questioned her at the station. *Id.*

A registered nurse who works as an independent contractor for Washoe County as a sexual assault nurse examiner testified that she examined Runnels. Exh. 19, pp. 189-220. She testified that Runnels had multiple vaginal injuries and that sustaining multiple injuries is consistent with non-consensual sex. *Id.*

With respect to Villatoro's claim in federal ground 1, during opening statements, the prosecutor said:

> You'll find out Arlee's [Brown's] story changes from what she told the police before the preliminary hearing. She [Arlee] starts, she goes down with the defendant. And they go together to the Public Defender's Office. And while they're down there, they meet with one of his defense attorneys, and the the, the defendant and Arlee Brown watch the defendant's confession. They watch Arlee Brown's interview, they watch the victim's interview, they read the entire police file. And then after all that –

Exh. 14, pp. 22-23. At that point, the defense objected.

7

After a discussion at the bench, the judge excused the jury for the rest of the day. *Id.* at 23.  After the jury left, the judge described what had happened:

> The record should reflect that Ms. Druckman [the prosecutor] has a power point slide, and it states: Joanna Roberts, the defendant's lawyer, and then bullet point: Met with the defendant and Arlee Brown in her office and discussed the case with them together.  Bullet point: She allowed the defendant and Arlee Brown to mutually watch everyone's interviews. Discuss them.
>
> And then there was an objection. And then Court stopped the proceedings.

*Id.* at 24. The prosecutor acknowledged that later bullet points in her presentation concerned defense counsel's purported review of medical records and police reports with the defendant and with Arlee Brown. *Id.* at 26.

The defense moved for a mistrial, arguing that the state had falsely portrayed defense counsel as coaching Brown.  *Id.* at 35.

The district court denied the request but ordered the prosecutor to remove any reference to Ms. Roberts in the power point presentation. *Id.* at 36-37.  The court further noted that "[i]n my years of being a trial judge, I've never, ever had a prosecutor do this. This is bizarre. It – and it's totally unnecessary." *Id.* at 36.  The court admonished the State "that if you try to pull this stunt ever again, or, in this trial, I will grant a mistrial, and I will refer it to the State bar." *Id.* at 37.

When trial resumed the next day, the defense renewed its motion for mistrial.  Exh. 18, pp. 1-8.  The court again noted the "inappropriate behavior" of the prosecutor but denied the motion.  *Id.* at 9.

In the alternative, defense counsel then requested the following curative instruction:

> The prosecutor made certain uncalled for insinuations about defense counsel. The prosecutor's improper remarks amount to an attempt to prejudice you against the defendant. The prosecutor presented opening statements. During that presentation an objection was made by defense counsel. The prosecutor engaged in improper argument which unfairly disparaged the motive of defense counsel. You are to disregard any references made by the prosecutor regarding defense counsel Joanna Roberts. Nothing counsel says during opening statement is evidence. The

8

> Court will remedy the misconduct of the prosecutor outside the presence of the jury.
>
> Were you to believe the unwarranted insinuations and convict the defendant on the basis of them, I will have to declare a mistrial. Therefore, you must disregard these improper, unsupported remarks.

*Id.* at 14-15. The judge denied this request.

The jury returned, and the court addressed the jury:

> Before we continue with opening statements, the Court wants to remind you that the statements and arguments of the attorneys are not evidence in this case. You have received no evidence or heard no testimony in this case. And throughout the trial I will be, as the law requires, I must remind you at every break that you are not to form any ultimate conclusion regarding this case until you have heard all of the testimony, the sworn testimony from the witness stand, that you have received all of the evidence that will be admitted by the Court pursuant to law, and that you have been instructed on the case.
>
> But again, the arguments, the statements, the questioning of the lawyers, the chatter back and forth between the lawyers, that's not evidence.

*Id.* at 20-21.

Affirming the convictions on direct appeal, the Nevada Supreme Court concluded that the district court did not err in denying the motion for mistrial and rejecting the proposed jury instruction to correct an instance of misconduct. Exh. 29, p. 3. The state supreme court reasoned that "[g]iven the passing nature of the prosecutor's insinuation and the district court's instruction to the jury, we find no abuse of discretion in either the denial of Villatoro's motion or the rejection of his proposed jury instruction." *Id.*

This court concludes that Villatoro has not demonstrated that federal habeas relief is warranted on this claim. He has not demonstrated that this brief statement made during opening argument so infected the trial with unfairness as to make it a violation of due process. Defense counsel objected, and the court quickly halted the State's improper comments and admonished the State outside of the jury's presence. The court then reminded the jury that opening statements are not evidence. Moreover, while the prosecutor improperly interjected the public defender into her opening statement, Arlee

9

Brown was thoroughly questioned on direct and cross. The record reflects that the jury had ample opportunity to assess her credibility. Villatoro has failed to show that the Nevada Supreme Court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Federal habeas relief is denied as to ground 1.

### b. Ineffective Assistance of Trial Counsel Claims

In grounds 3 and 4 Villatoro contends that his trial counsel rendered ineffective assistance. Ineffective assistance of counsel claims are governed by the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that a petitioner claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense. *Williams*, 529 U.S. at 390-91 (citing *Strickland*, 466 U.S. at 687). To establish ineffectiveness, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id.* To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id.* Additionally, any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689. It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *Id.*

Ineffective assistance of counsel under *Strickland* requires a showing of deficient performance of counsel resulting in prejudice, "with performance being measured

10

against an objective standard of reasonableness, . . . under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations and citations omitted). When the ineffective assistance of counsel claim is based on a challenge to a guilty plea, the *Strickland* prejudice prong requires a petitioner to demonstrate "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

If the state court has already rejected an ineffective assistance claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.*

The United States Supreme Court has described federal review of a state supreme court's decision on a claim of ineffective assistance of counsel as "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1413 (2009)). The Supreme Court emphasized that: "We take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'" *Id.* at 1403 (internal citations omitted). Moreover, federal habeas review of an ineffective assistance of counsel claim is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181-84. The United States Supreme Court has specifically reaffirmed the extensive deference owed to a state court's decision regarding claims of ineffective assistance of counsel:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.* at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at ——, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at ——, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d)

11

applies, the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105. "A court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* at 104 (quoting *Strickland*, 466 U.S. at 689). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id.* (internal quotations and citations omitted).

**Ground 3**

Villatoro claims that defense counsel rendered ineffective assistance in violation of his Sixth and Fourteenth Amendment rights when they failed to seek a DNA expert for trial (ECF No. 9, pp. 14-15).

Washoe County crime laboratory personnel testified at trial that "[p]ositive results for the presumptive presence of semen" were found when swabs from Runnels' genital area were analyzed. Exh. 19, p. 40. Defense counsel asked an analyst if she could tell whether the DNA on a sample came from saliva or semen, and the analyst replied: "we are not able to tell where that DNA came from." *Id.* at 87.

Villatoro now argues that his trial counsel should have conducted further investigation to determine whether this evidence could be consistent with Villatoro's claim that he only engaged in consensual cunnilingus with Runnels and whether two other men could have been the source of the semen (ECF No. 9, p. 14).

In its order affirming the denial of Villatoro's state postconviction habeas petition, the Nevada Supreme Court concluded that Villatoro failed to demonstrate deficiency or prejudice, reasoning:

> Appellant's defense was that the sexual contact was consensual; therefore, evidence of another person having had similar contact with the victim would have been irrelevant. Further, appellant did not say why counsel should have doubted and thus sought to impeach the victim's statement that she had not recently been sexually active. Thus even if his claims were true, appellant would not have been entitled to relief. *See Hargrove v. State*, 100 Nev. 498, 502-03, 686 P.2d 222, 225 (1984)

12

> (holding that a petitioner is not entitled to an evidentiary hearing where his claims are unsupported by specific factual allegations that, if true, would have entitled him to relief). We therefore conclude that the district court did not err in denying this claim without an evidentiary hearing.

Exh. 46, p. 3.

Villatoro's claim here fails. The defense theory of the case was that he and Runnels engaged in consensual oral sex. Thus, defense counsel elicited testimony that it was not possible to determine whether the DNA was from saliva or semen in order to support the theory that the DNA was not from semen. A crime lab analyst testified that Villatoro could not be excluded as the source of the DNA. As the Nevada Supreme Court pointed out, any evidence that other DNA was also identified was not relevant.

Villatoro has not demonstrated that the Nevada Supreme Court's decision on federal ground 3 was contrary to, or involved an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Accordingly, ground 3 is denied.

**Ground 4**

Villatoro contends that trial counsel was ineffective for failing to proffer a reasonable curative instruction in response to the prosecutor's improper statements during opening arguments (ECF No. 9, p. 16). He asserts that the instruction defense counsel proffered was above and beyond what was appropriate under the circumstances, that the court would have given the jury a more reasonable instruction, and that it is reasonably probable that the outcome of trial would have been different.

The curative instruction the defense proffered is set forth above in the discussion of ground 1. Affirming the denial of the state postconviction petition, the Nevada Supreme Court again held that Villatoro failed to demonstrate deficiency or prejudice. Exh. 46, p. 3. The state supreme court pointed out that Villatoro did not "state what instruction counsel should have requested that would have had the desired effect of both alleviating the misconduct and not calling it to the jury's attention." *Id.*

13

Villatoro has not explained what instruction should have been requested and has not shown a reasonable probability of a different outcome of trial. He has not demonstrated that the Nevada Supreme Court's decision on federal ground 4 was contrary to, or involved an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Federal habeas relief is denied as to ground 4.

Therefore, the petition is denied in its entirety.

### IV. Certificate of Appealability

This is a final order adverse to the petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA). Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id*.

Having reviewed its determinations and rulings in adjudicating Villatoro's petition, the court finds that none of those rulings meets the *Slack* standard. The court therefore declines to issue a certificate of appealability for its resolution of any of Villatoro's claims.

### V. Conclusion

**IT IS THEREFORE ORDERED** that the amended petition (ECF No. 9) is **DENIED** in its entirety.

14

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk shall enter judgment accordingly and close this case.

DATED: This 6th day of November, 2018.

_____
ROBERT C. JONES
UNITED STATES DISTRICT JUDGE